IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| DEBRA ANN DARDEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.   3:14CV88 -WHA |
| | ) | |
| HALLA VISTEON CLIMATE CONTROL, | ) | (wo) |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

This case is before the court on a Motion for Summary Judgment filed by Defendant Halla

Visteon Climate Control Alabama Corp. ("Halla") (Doc. #15).

The Plaintiff filed her Complaint in this court bringing claims for discrimination, hostile

environment, and retaliation on the basis of race pursuant to Title VII and 42 U.S.C. § 1981

(Counts One through Three); discrimination, hostile work environment, and retaliation on the

basis of religion under Title VII (Counts Four through Six); retaliation under the Age

Discrimination in Employment Act and the Alabama Age Discrimination in Employment Act

(Count Seven); and retaliation and discrimination in violation of the Fair Labor Standards Act

(Count Eight).[1]

For the reasons to be discussed, the Motion for Summary Judgment is due to be

GRANTED.

**II.   SUMMARY JUDGMENT STANDARD**

Summary judgment is proper "if there is no genuine issue as to any material fact and . . . the

---

1 The court has used the numbering adopted by the Plaintiff in referring to these claims.

moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.   Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."   Fed. R. Civ. P. 56 (c)(1)(A),(B).   Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).   On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a).

## III. FACTS

The submissions of the parties establish the following facts, construed in a light most favorable to the non-movant:

Plaintiff Debra Ann Darden ("Darden") was an African American employee of Halla. Halla is a subcontractor to Hyundai Motor Corp. in Montgomery, Alabama and Kia Motors in West Point, Georgia. Darden was an Assistant Team Leader on an assembly line.

On June 22, 2013, Darden was scheduled to work a ten-hour shift from 6:30 p.m. to 5:15 a.m. Area Lead Hand Cynthia Lewis ("Lewis") told Darden and her team that if they completed 400 parts, they could leave early. Around 1:00 a.m., Darden's team was close to completing the 400 parts. Darden asked Lewis about leaving early. Lewis said that Darden should ask her supervisor, Marvin Jones ("Jones"). When asked, Jones said that he would have to ask the second shift Superintendent Tom Himes ("Himes"). Darden asked Himes, and mentioned that the day shift had left early. Himes told Darden to call the Plant Manager. She declined to do so, and went back to her work area.

Himes came to Darden's area, showed her a document and referred to her as "you people." Darden understood this phrase to be a reference to her race. Darden states that Himes said "you people make me sick," and "you people think you run the plant," put his finger in Darden's face and when she asked him to move it, said he could put his finger anywhere he wanted to put it. (Doc. #15-5 at p.85:2-7). Darden has said she asked Himes what he meant when he referred to "you people," and when he did not respond, she said she was going to turn the matter over to God. Himes then told her that her God was a liar.

After this encounter, Darden called John Edenfield ("Edenfield"), with Human Resources to report what had happened.   Darden left a voicemail message for Edenfield.   She stated in her deposition that she informed Edenfield that Himes had said "you people," and maybe referred to her god as a liar, but at other points in her deposition, her recollection of the voicemail message is less clear.   Darden did not leave the plant early, and clocked out of her shift at 5:15 a.m.[2]

On the following Monday, Darden called Edenfield and he told her that he was looking into the situation. When Darden arrived for her shift that evening, Edenfield met with Darden. Marvin Hones, the HEX Supervisor, was also present at the meeting. (Doc. #15-2 at p.62:6-9).   Edenfield informed Darden that there was a video recording taken on June 23rd which included the incident with Himes, but which also revealed that Darden did not do any work for about three hours after her encounter with Himes.   Darden stated in her deposition that she tried to tell Edenfield what happened that night, but that Edenfield kept telling her he had reviewed the video and that matter was under investigation.   (Doc. #15-5 at p.98: 17-23).   Edenfield sent Darden home with pay pending the investigation.

Edenfield reviewed five hours of video footage which revealed that Darden was gone from her work station area for over three hours on June 23.   (Doc. #15-2 at p.73:12-17).   Edenfield testified in his deposition that three people in her work "area continued to work and they said they had work to do, and that they continued to work unto the end of the shift and everybody else in the department continued to work until the end of the shift."   (Doc. #15-2 at p.71:8-12).   Edenfield sent the results of his investigation to corporate headquarters and was given approval of his decision to terminate Darden.

---

2 Edenfield states in his deposition that Darden said only that she was upset about Himes waiving his finger and that her shift was not treated the same as the first shift.   (Doc. #15-2 at p.49:17-23).

Leaving the work area without proper relief or permission from the supervisor is a violation of a work rule in the Halla employment handbook, which further provides that violation of plant rules may result in immediate termination.

On Friday, June 28, Edenfield called Darden to set up a meeting.   He met with Darden, and Hallo employee Judi Herrara was also present, and told Darden that her employment had been terminated because Darden had walked around the plant for several hours without working, but had claimed that time as if she had been working.   (Doc. #15-2 at p.75:12-16).

## IV. DISCUSSION

Darden has brought claims for disparate treatment and retaliation on the basis of race and regligion, racial and religious hostile environment claims, retaliation on the basis of age claims, and Fair Labor Standards Act claims.   Halla has moved for summary judgment as to all of Darden's claims. Darden does not address the aspects of Halla's motion which relate to her age and FLSA claims, and in fact states in her brief only that she contends she has established religious and race discrimination, harassment, and retaliation claims.   The court finds no question of fact precluding summary judgment as to the age and FLSA claims, and concludes that summary judgment is due to be GRANTED as to the claims in Counts Seven and Eight of the Complaint.

The court will follow the organization of the discussion of the remaining claims as adopted in the Motion for Summary Judgment, beginning with the disparate treatment claims, then harassment claims, and finally the retaliation claims.

A.   Disparate Treatment on the Basis of Race and Religion

Where, as here, the plaintiff seeks to prove intentional discrimination by using circumstantial evidence of intent, the court applies the framework first set out by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).   Under this

framework, the plaintiff must establish a prima facie case of discrimination.   *McDonnell Douglas*, 411 U.S. at 802.   After the plaintiff has established a prima facie case of discrimination, the burden of production is placed upon the employer to articulate a legitimate nondiscriminatory reason for its employment action.   *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).   The plaintiff may seek to demonstrate that the proffered reason was not the true reason for the employment decision "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."   *Id.* at 256; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).   A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.   *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000).   That is, even if a plaintiff establishes a prima facie case and offers sufficient evidence of pretext as to each of the proffered reasons, summary judgment "will sometimes be available to an employer in such a case."   *Chapman v. AI Transport*, 229 F.3d 1012, 1025 n.11 (11th Cir. 2000).

Halla contends that Darden cannot establish a prima facie case of disparate treatment on the basis of religion or race because there is no evidence that she was replaced by someone outside of either protected class.   Instead, the position was eliminated.   Halla presents Edenfield's deposition testimony in which he states that Darden was initially replaced by "half a dozen temps" and then the decision was made "not to fill the assistant team leader position again, and we eventually did away with all the assistant team leader positions."   (Doc. #15-2 at p.76: 4-17). Halla also states that Darden can point to no evidence that she was treated less favorably than someone outside of her protected classes.

Darden responds that she can establish a prima facie case because it is sufficient for purposes of a prima facie case that no replacement was selected for a significant time, citing the Fourth Circuit decision, *Miles v. Dell*, *Inc.*, 429 F.3d 480, 486 (4th Cir. 2005).

This court cannot conclude that the non-binding *Miles* case applies here because the Eleventh Circuit has addressed the formulation of a prima facie case when a plaintiff is terminated and not replaced. In *Connelly v. Metro. Atlanta Rapid Transit Auth*., 764 F.3d 1358, 1364 (11th Cir. 2014), the court stated that to establish a prima facie case of racially discriminatory discharge, a plaintiff has to prove that "he was a member of a protected class; he was qualified for the job; he was terminated despite his qualifications; and after his termination the position remained open and the employer continued to seek applicants of similar qualifications." The facts in *Connelly* were that the employer sought no applicants for the position after the plaintiff was terminated, the employer left the position vacant for nearly a year and a half, and the employer eventually created a new position. *Id.* Under these facts, the court upheld the district court's finding that the plaintiff had failed to establish a prima facie case. *Id.*

Darden has not shown that her position remained open and the employer continued to seek applicants of similar qualifications. *Id.* Instead, the undisputed evidence is that there was never a permanent replacement for Darden, because the position was initially filled with temporary employees and Halla eventually eliminated the position of Assistant Team Leader. This evidence brings this case within the reasoning of *Connelly*, where no prima facie case was established. *Id.* In addition, Darden has presented no evidence that a similarly-situated comparator was treated more favorably to satisfy the prima facie case. Summary judgment, therefore, is due to be GRANTED as to disparate treatment claims based on race and religion.

B. Harassment Claims

To establish a prima facie case of unlawful harassment, a plaintiff must show (1) she belongs to a protected group, (2) she has been subjected to unwelcome harassment, (3) the harassment was based on a protected characteristic, (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment, and (5) a basis for holding the employer liable.  *Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1244-45 (11th Cir. 2004).

The court will separately address Darden's harassment claims based on race and religion.

1. Race

Halla argues that Darden has failed to demonstrate that she suffered severe or pervasive harassment on the basis of race.   Darden argues that a single incident of offensive conduct may be sufficient to create a Title VII and § 1981 violation, particularly if the harassment is physical. Darden says that Himes used the phrase "you people," in saying "you people make me sick," and "you people think you run the plant," put his finger in Darden's face and when she asked him to move it, said he could put his finger anywhere he wanted to put it.   Darden argues that Himes's behavior was physically menacing and, combined with demeaning racist language, was harassment, and citing *Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999).

Halla argues that the evidence in this case does not rise to the level of harassment, citing to decisions of other courts in which aggressive finger pointing was found not to be sufficiently severe to constitute harassment.   *See, e.g., Brown v. Johns Hopkins Hospital*, No. RDB-13-3258, 2014 WL 3898150, at *11 (D. Md. Aug. 6, 2014).

The Eleventh Circuit has identified the following four factors to be considered in determining whether harassment objectively altered an employee's terms or conditions of

employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the

conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the

conduct unreasonably interferes with the employee's job performance.   *Allen v. Tyson Foods*, 121

F.3d 642, 647 (11th Cir.1997).   Courts should examine the conduct in context, not as isolated acts,

and determine under the totality of the circumstances whether the harassing conduct is sufficiently

severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a

hostile or abusive working environment. *Id.*

Less severe acts of harassment must be part of a pattern, but if the plaintiff is relying on a

single incident, that incident must be "extremely serious" to constitute harassment.   *Faragher v.*

*City of Boca Raton*, 524 U.S. 775, 787 (1998); *see also E.E.O.C. v. WC&M Enterprises, Inc.*, 496

F.3d 393, 400 (5th Cir. 2007) (stating that "[u]nder the totality of the circumstances test, a single

incident of harassment, if sufficiently severe, could give rise to a viable Title VII claim as well as a

continuous pattern of much less severe incidents of harassment.")

The *Smith* case Darden relies on involved a supervisor twisting an employee's wrist,

drawing blood and causing damage to ligaments, and requiring surgical correction. 189 F.3d at

533.   Clearly, the conduct at issue in the instant case does not rise to that "extremely serious"

level, as Darden has presented no evidence of injury inflicted in this case.   Instead, the evidence

demonstrates that Himes's conduct, while unprofessional, was not sufficiently severe to support a

claim of harassment.   *See Brown*, 2014 WL 3898150 at *11.[3]

Darden further argues that she need not establish that the harassment was severe or

---

3 Darden does not appear to argue that she can establish sufficient pervasiveness to support her
claim, but, considering all of the relevant factors, the court also concludes that the evidence
adduced of a couple of racial comments and aggressive finger-pointing on one occasion also is not
sufficient to establish pervasive conduct.   *See Faragher*, 524 U.S. at 788.

pervasive because when harassment results in a tangible employment action, whether the conduct

is severe or pervasive is irrelevant, citing *Austin v. Mac-Lean Fogg Co.,* 999 F. Supp. 2d 1254

(N.D. Ala. 2014).

The *Austin* case cited by Darden is a sexual harassment case involving conduct of a sexual

nature.   The Eleventh Circuit has explained that sexual harassment can alter the terms and

conditions of employment in two ways, and one way is that if "the employee's refusal to submit to

a supervisor's sexual demands results in a tangible employment action being taken against her."

*Hulsey*, 367 F.3d at 1244.   This was formerly referred to as "quid pro quo" sexual harassment.   In

recent years, the Supreme Court has eliminated use of the terms "hostile environment" and "quid

pro quo," but the latter method of proof requires a showing that a supervisor took a "tangible

employment action against an employee because she refused to give in to his sexual overtures."

*Id.* at 1245.

The harassment claim Darden brings does not fit within this analysis.   She has argued that

she suffered instances of racial comments and an aggressive hand gesture, and ultimately was

terminated from her employment.[4]  Darden has not pointed to any evidence that a tangible

employment action was threatened or taken against her because she failed to acquiesce to any

demands.

Summary judgment is, therefore, due to be granted as to her racial harassment claim.

### 2.   Religion

Halla states that there is no evidence of severe or pervasive harassment on the basis of

religion. The evidence of religious comments is Himes's statement that Darden's god is a liar and

---

4 Darden has argued that she was terminated because she complained about harassment, but that is
her separately-asserted retaliation theory.

that Himes criticized an African American church near his house.   Darden also points to the

evidence of Himes aggressively putting a finger in Darden's face.   Considering the relevant

factors, *Allen*, 121 F.3d at 647, the court concludes that the evidence does not establish sufficiently

severe or pervasive conduct, or that a tangible employment action was taken based on a failure to

submit to demands of a supervisor, *Hulsey*, 367 F.3d at 1244, and that summary judgment is due to

be GRANTED as to the religious harassment claim.

### B.  Retaliation

Darden brings claims that her termination was retaliation for her complaint of racial and

religious harassment.

### 1.   Prima Facie Case

A prima facie case of retaliation requires the plaintiff to show that (1) she engaged in

protected activity, (2) she suffered a materially adverse employment action, and (3) some causal

relation between the two events.   *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir.

2001).   A protected activity can include engaging in statutorily protected expression in the form

of opposition or participation.   *E.E.O.C. v. Total Sys. Servs., Inc*., 221 F.3d 1171, 1174 (11th Cir.

2000).

Halla takes the position that Darden did not engage in protected conduct because she did

not communicate a belief that discrimination occurred.   Halla argues that Darden's voicemail

complaint to Edenfield was about Himes pointing his finger in her face, but that there is no

affirmative evidence that she told Edenfield that Himes referred to "you people," or that her "god

was a liar."   Halla acknowledges that Darden relies on her Responses to Defendant's First

Interrogatories and Requests for Admission as evidence that she voiced those complaints.   Halla

argues, however, that her Responses to Interrogatories conflict with later deposition testimony,

and, therefore, should not be considered by the court.

Given additional time in which to respond to Halla's arguments, Darden argues that her Responses to Interrogatories need not be disregarded because they were submitted before her deposition.   There is precedent for the approach Halla takes, however.   *See Santhuff v. Seitz*, 385 F. App'x 939, 943 (11th Cir. 2010) (affirming exclusion of witness's conflicting affidavits which "were contradicted by his later deposition testimony.").

As Halla points out, when Darden was asked in her deposition about her complaint to Edenfield on his voicemail, she stated that she reported to Edenfield that Himes put his finger in her face, but she "really can't say" whether she told Edenfield that Himes used the phrase "you people." (Doc. #15-5. at p. 95:5-17).   At an earlier point in the same deposition, however, Darden stated, "I do remember I told him that Tom and I had a confrontation . . . and he called me 'you people.'" (Doc. #15-5 at p. 89:17-23).

Darden also stated in her deposition that she did not mention God to Edenfield, but the context of her answers to deposition questions was her personal meeting with Edenfield, not the voicemail message. (Doc. #15-5 at p. 119:3-13) (asking Darden if she mentioned God to Edenfield when she was "in his office that time.").

Upon consideration of the evidence before the court, it appears that there is some evidence to support that Darden engaged in a protected activity.   Darden affirmatively stated in her deposition "I do remember I told him that Tom and I had a confrontation . . . and he called me 'you people.'" (Doc. #15-5 at p. 89:17-23).   Therefore, there is admissible evidence that she voiced that opposition to Edenfield, even if the court only considers her deposition testimony.   Darden stated in her Responses to Interrogatories that she thinks she mentioned the "your god is a liar" comment on Edenfield's voicemail.   The deposition testimony cited by Halla does not conflict

with that evidence because, drawing all reasonable inferences in favor of the non-movant, it

concerns an in-person meeting in Edenfield's office.   The court concludes, therefore, that there is

admissible evidence that Darden engaged in a protected activity by complaining on Edenfield's

voicemail about race and religion-based comments.[5]


2.    Legitimate, Non-retaliatory Reason and Darden's Showing to Establish Pretext

Halla's legitimate, non-discriminatory reason for Darden's termination as stated in the

Halla counseling form, is that Darden's employment was terminated "for violation of the company

policy on abandoning your job and falsification of time work." (Doc. #15-8).

Darden argues that the explanation articulated for her termination is pretextual because it is

not true that Darden stole time from her employer.   Darden contends that in the hours following

her altercation with Himes on June 23, she had no work to do, but she remained within the plant,

and she did complete work tasks during that time, including keying in numbers and cleaning up.

Darden points out that her timecard states that Edenfield authorized the hours that she was paid,

but then Edenfield fired her for stealing those hours.   Darden further contends the video which

Edenfield said that he relied on has been taped over, allowing for an adverse inference.   Darden

5  Darden also states in her brief that she complained first to Himes about his conduct and that
Himes served as a "cat's paw" for Halla's liability. Halla points out that the identified protected
activity in the Complaint is the complaint to Edenfield, not Himes. The court agrees that the
retaliation claim in the Complaint was based on a complaint to Human Resources. (Doc. #1 and
#1-1).   *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (explaining that
a plaintiff may not amend her complaint through argument in a brief opposing summary
judgment).   The court cannot conclude that there is evidence sufficient to create a genuine factual
dispute as to cat's paw liability for a retaliation claim because there is no evidence of any
retaliatory animus on the part of Himes.   *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331
(11th Cir. 1999) (explaining that a cat's paw theory requires the plaintiff to prove that
discriminatory animus behind the recommendation, and not the underlying employee misconduct
identified in the recommendation, was an actual cause of the other party's decision to terminate the
employee).

contends that the punishment she received did not fit the infraction. Finally, Darden states that pretext has been established because Edenfield would not let her explain her side of the events. The court considers all of these arguments together for purposes of evaluating whether there is a question of fact as to pretext, but will address each one separately.

**Credence of articulated reason**

Darden argues that it is not true that she stole time from Halla. Darden does not pont to evidence to dispute that she was paid for time which was not spent performing work tasks, but instead disputes that she had any work tasks to complete. In Responses to Interrogatories, Darden argues that she had no work to do following her altercation with Himes. (Doc. #15-3 at p.11). In her deposition, she stated that there were no more carts with parts on them. (Doc. #15-5 p. 50:12-24). Darden also stated in her deposition that there were no more parts to be worked on in the alley where they picked them up, or in the back. (Doc. #15-5 at p.50: 12-21).

Halla points out, however, that Darden also said in her deposition that Darden could not say whether there were parts on the trucks, and stated that she did not ask anyone to get more parts. (Doc. #15-5 at p. 51:4-12). Halla cites to Edenfield's deposition testimony that Darden said that she did not have any work to do "but the three people in the area continued to work and they said they had work to do, and they continued to work until the end of the shift and everybody else in the department continued to work until the end of the shift." (Doc. #15-2 at p.71:8-12). Halla responds to Darden's argument that her time card was approved by pointing out that Darden was suspended from work with pay while Edenfield conducted an investigation, so the time was approved for payment during the investigation. When she was terminated, the payroll check

14

already had been run.   (Doc. #15-2 at p. 90:10-23).[6]

An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.   *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984).   Title VII simply prohibits the employer from discriminating on the basis of membership in a protected class. *Alvarez v. Royal Atl. Developers, Inc*., 610 F.3d 1253, 1266 (11th Cir. 2010).   Courts do not sit as a "super-personnel department," and it is not the role of a court to second-guess the wisdom of an employer's business decisions as long as those decisions were not made with a discriminatory motive. *Id.*   "That is true [n]o matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers." *Id.* (quotation marks and citations omitted).

In this case, the evidence is that Darden was not working for the entire time she was at the plant after her disagreement with Himes, but Darden takes the position that she was not performing work tasks during some of that period because there was no work for her to do.   Edenfield has stated that based on conversations with other people in her department he concluded there was work that Darden could have been doing.   The Eleventh Circuit has explained in the similar context of an employer's investigation of a complaint of harassment, that "[w]hen the resulting employer's investigation . . . produces contradictory accounts of significant historical events, the employer can lawfully make a choice between the conflicting versions—that is, to accept one as true and to reject one as fictitious—at least, as long as the choice is an honest choice." *E.E.O.C.*,

---

6 Edenfield stated in his deposition that Darden could have told them that she was upset and chose not to work and should not be paid for that time, but she did not do that.   (Doc. #15-2 p. 90:4-9).

221 F.3d at 1176.   A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by retaliation for a protected activity.   *Id.* Whether Edenfield was mistaken in his belief that there was work that Darden could have done during the remainder of her shift, there has been no showing that it was not his honest belief, or that he was actually motivated by a complaint of discrimination by Darden.

**Scope of Investigation**

Darden argues that she was not allowed to give her version of the events at issue when she met with Edenfield.   Darden cites *Donovan v. Peter Zimmer America, Inc*., 557 F. Supp. 642, 651 (D.S.C. 1982), and other cases for the proposition that pretext can be shown if an employee is not given an opportunity to explain the employee's version of events.

Halla responds that the non-binding *Donovan* decision is inapposite in that the lack of an opportunity to explain their version of the events in question was just one of many considerations made by that court, and because, Halla argues, Darden was given an opportunity to present her version of the events.   Halla cites to a Memo For the Record, dated June 24, 2013, which Halla states is a record of Edenfield's notes from the meeting he held with Darden, also attended by Assistant Team Leader and HEX Supervisor Jones.   According to that document, during the meeting Edenfield had with her he asked Darden why she did not work between 1:00 and 4:00 a.m. (Doc. #15-7).   Edenfield recorded that Darden told him that she did not do any work because she had gotten her numbers and she was mad. (Doc. #15-7 at p. 2, 3).   Darden does not offer evidence to refute this aspect of Halla's evidence.[7]

---

7  Edenfield also recorded that Darden said she would either have to walk around the plant or hit Himes. Darden has offered her deposition testimony in which she states that she did not agree that she said that. (Doc. #15-5 at p.100: 3-7), so the court has not considered Edenfield's statement about Darden stating she chose to walk around instead of hitting Himes.

In her deposition, however, Darden stated that while meeting with Edenfield, she attempted to explain to him what happened during and after the altercation with Himes, but that Edenfield would not let her explain and kept referring to the surveillance video.   (Doc. #15-5 at p.99).    She stated that she was trying to tell him why she left the work area each time, and that she recalled telling him that in the future she would just have to slow things down so that she never ran out of work.   (Doc. #15-5 at p.100:8-12).

Darden's testimony that she told Edenfield that in the future she would have to slow down so that she did not run out of work tasks, and Halla's document demonstrating that she told Edenfield she did not perform work because she was "mad," is evidence that she was asked to and allowed to provide some explanation about her actions on June 23, therefore, the court does not find the *Donovan* or other cases cited by Darden regarding investigations applicable in this case. Furthermore, even in light of Darden's testimony that she was not allowed to explain the circumstances as much as she wanted to, given that the heart of the pretext inquiry is not whether the court agrees with the employer's reason for discharge, but whether the employer really was motivated by those reasons, *Standard,* 161 F.3d at 1333, and given that it is undisputed that Darden was paid for time she did not work, the court cannot conclude that the investigation of the events of June 23 undermines the articulated reason for Darden's termination.

**Proportionality**

Darden argues that the disciplinary action taken against her does not fit the infraction, and so is evidence of pretext.   In support of this argument, Darden cites evidence and cases from other circuits including *Conley v. Yellow Freight*, 521 F. Supp. 2d 713 (E.D. Tenn. 2007).   Halla's evidence is Edenfield's deposition testimony that a white male employee had previously been terminated by Halla for being out of the plant without permission for over two hours and claiming

that time as paid time.   (Doc. #15-2 at p.108:7-109:10).   The cases cited by Darden are

distinguishable, because in those there was evidence that others were treated more favorably even

though they engaged in the same conduct as the plaintiff, so that the plaintiff's worse treatment

was disproportionate.   *See, e.g., Conley*, 521 F. Supp. 2d at 730 (stating that there was "evidence

of other employees engaging in identical violations . . . without repercussion.").   That was not the

case here, where the only comparative evidence is of a white employee being treated the same.

The Eleventh Circuit has explained that a plaintiff may not establish that an employer's

proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least

not where the reason is one that might motivate a reasonable employer.   *Alexander v. Fulton

County*, 207 F.3d 1303, 1339 (11th Cir. 2000).   Here, Darden compares the termination of another

employee who claimed time he did not actually work while he was outside of the plant with her

own termination for claiming time she did not actually work while she was inside the plant,

although not at her assigned station and argues that this makes a difference.   A reasonable

employer might find the situations to be the same, and termination to warranted in both instances.[8]

Therefore, the court cannot conclude that there is evidence of disproportionality to discredit the

articulated reason for Darden's termination.

**Adverse Inference From Lost Videotape Evidence**

Darden argues that pretext has been established because the video tape upon which

Edenfield based the termination decision was taped over.   Darden provides the court with a

December 1, 2014 email from her attorney in which he requested the "complete video recordings"

for the night in question.   (Doc. #22-3 at p.2).   The response to that email stated that the entire

---

8   Edenfield stated in his deposition that he viewed the two infractions as the "[s]ame thing."
(Doc. #15-2 at p. 108: 11-12).

18

video tape was recorded over after 30 days because Darden never denied being gone from her work station for three and a half hours.   (Doc. #22-3 p.37).

Responding to this evidence, Halla points to its Response to Request for Production of Documents in which it stated that it had previously provided Darden "with a copy of the video of the Plaintiff's work station on the night of June 23, 2013." (Doc. #22-2 at p.4).   In its brief, Halla states that it preserved and produced the part of the videotape that contains the interaction between Himes and Darden.   Darden does not offer evidence to dispute that the portion of the tape which was lost was the portion revealing only that Darden did not remain at her work station.   Halla argues that there was never a dispute that Darden was away from her work station, so the part of the tape which was taped over, showing that she was not at her work station, was not needed.

An adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith. *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997).   "Mere negligence" in destroying the records is not enough for an adverse inference, as "it does not sustain an inference of consciousness of a weak case." *Id.*

In this case, the court cannot conclude that an adverse inference should be drawn under the circumstances.   Given the unrefuted evidence that part of the tape was disclosed to Darden, and that Darden was not working at her work station after her confrontation with Himes until the end of her shift, the court cannot conclude that Darden has made a showing of bad faith in the taping over the tape.[9]

In conclusion, the court finds that Darden's pretext arguments regarding the truthfulness of the articulated reason, the scope of the investigation, the proportionality of the employment action,

---

9  Given that it is undisputed that Darden was not performing work tasks for her entire shift, it is unclear to the court how an adverse inference would support her claims, even if bad faith had been shown.

and the videotape evidence, including the evidence cited to support these arguments, do not create

a question of fact as to pretext, and that summary judgment is due to be GRANTED as to Darden's

retaliation claims.[10]

### V. CONCLUSION

For the reasons discussed, the court concludes that Darden has failed to create a question

of material fact as to her disparate treatment, harassment, retaliation, and FLSA claims.

Therefore, the Motion for Summary Judgment is due to be and is hereby ORDERED

GRANTED.    A separate Judgment will be entered in accordance with this Memorandum

Opinion and Order.

Done this 10th day of April, 2015.

/s/ W. Harold Albritton
W.   HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE

---

10 Halla has argued that Darden has failed to undertake any "but for" analysis.    A plaintiff making
a Title VII retaliation claim must establish the activity was a but-for cause of the alleged adverse
action, but the Supreme Court did not clarify the role of "but for" causation in a plaintiff's prima
facie case*." Ramirez v. Bausch & Lomb, Inc*., 546 F. App'x. 829, 833 n. 2 (11th Cir.2013). The
court agrees with Halla that Darden has not established but-for causation.